# Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995

The Mexican Debt Disclosure Act of 1995 requires that, before certain assistance is extended to Mexico, the President must certify that he has provided the House of Representatives with the documents described in House Resolution 80. The President submitted a certification that indicated that the executive branch had not provided to the House certain documents because it would be inconsistent with the public interest to do so. The Act is best interpreted as incorporating an exception for those documents as to which disclosure would not be in the public interest. Therefore, the President's certification was a legally sufficient formulation of the certification required by the Act.

June 28, 1996

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum sets forth the analysis underlying our conclusion that the President's April 14, 1995, certification regarding the use of the Exchange Stabilization Fund to assist Mexico was a legally sufficient formulation of the certification required by the Mexican Debt Disclosure Act of 1995, Pub. L. No. 104–6, tit. IV, 109 Stat. 73, 89.

## I.

### A.

Mexico suffered severe economic problems in 1994, leading to a thirty-two percent devaluation of the peso during the month of December. In January 1995, Congress debated legislative proposals to provide up to $40 billion in emergency assistance to Mexico to stabilize the peso. When it became clear that the legislative process would not work quickly enough to avert a liquidity crisis, the President announced on January 31, 1995, his intention to use the Treasury Department's Exchange Stabilization Fund ("ESF") to provide up to $20 billion of loans and credits as part of a financial support package designed to prevent the further destabilization of the Mexican peso and to halt the withdrawal of capital out of Mexico.[1]

---

[1] By statute, the ESF is to be used consistent with United States obligations with respect to the International Monetary Fund ("IMF"). See 31 U.S.C. § 5302. Article IV of the IMF Articles of Agreement requires the United States to "collaborate with the [IMF] and other members to assure orderly exchange arrangements and to promote a stable system of exchange rates." Second Amendment to the Articles of Agreement of the International Monetary Fund, approved Apr. 30, 1976, art. IV, § 1, 29 U.S.T. 2203, 2208, 15 I.L.M. 499, 549. Members are to fulfill their obligation "by fostering orderly underlying economic and financial conditions and a monetary system that does not tend to produce erratic disruptions." Id. The ESF "is under the exclusive control of the Secretary" of

Continued

The President made his announcement in a joint statement issued with the congressional leadership, including Senate Majority Leader Robert Dole, Senate Minority Leader Thomas Daschle, House Speaker Newt Gingrich, and House Minority Leader Richard Gephardt, all of whom expressed the view that the use of the ESF in connection with the support package was both lawful and necessary:

> We agree that, in order to ensure orderly exchange arrangements and a stable system of exchange rates, the United States should immediately use the Exchange Stabilization Fund (ESF) to provide appropriate financial assistance for Mexico. We further agree that under Title 31 of the United States Code, Section 5302, the President has full authority to provide this assistance. . . .
>
> . . . .
>
> We must act now in order to protect American jobs, prevent an increase in the flow of illegal immigrants across our borders, ensure stability in this hemisphere, and encourage reform in emerging markets around the world.
>
> This is an important undertaking, and we believe that the risks of inaction vastly exceed any risks associated with this action. We fully support this effort, and we will work to ensure that its purposes are met.[2]

On February 21, 1995, the United States entered into a series of agreements with Mexico by which the United States pledged to provide up to $20 billion in the form of currency swaps and securities guarantees ("U.S.–Mexico Agreements"). Under the terms of the agreements as announced by Secretary Rubin, $10 billion would be made available through the ESF in stages between February 21 and the end of June, 1995, as Mexico met agreed-upon conditions. Under the same terms and conditions, another $10 billion would become available beginning in July 1995, to be provided in stages as needed.[3]

## B.

On March 1, 1995, the House of Representatives adopted House Resolution 80 ("Resolution 80" or "the Resolution"), a resolution of inquiry "requesting

---

the Treasury, who may use the ESF as he "considers necessary," "[s]ubject to approval by the President." 31 U.S.C. § 5302(a)(2).

[2] *Statement with Congressional Leaders on Financial Assistance to Mexico,* 1 Pub. Papers of William J. Clinton 130 (1995).

[3] Statement of Treasury Secretary Robert E. Rubin, Mexico Agreement Signing Ceremony (Feb. 21, 1995).

information from the President concerning actions taken to strengthen the Mexican peso and stabilize the economy of Mexico."[4] The Resolution began by stating:

> Resolved, that the President is hereby requested to provide to the House of Representatives (consistent with the rules of such House), not later than 14 days after the adoption of this resolution, the following documents in the possession of the executive branch, if not inconsistent with the public interest.[5]

This initial paragraph of Resolution 80 was followed by 28 numbered paragraphs, each identifying substantive categories of requested documents.

In presenting the Resolution for consideration by the House, Representative James Leach, Chairman of the House Committee on Banking and Financial Services ("Banking Committee"), stated that:

> It is . . . the obligation of Congress and the Committee of jurisdiction in particular to review how Mexico got into this dilemma and what obligations the U.S. Government has undertaken to resolve the crisis. It is also the obligation of this Congress to assess why and how Mexico lost its way and whether the U.S. government failed to recommend or insist that Mexican officials follow a less bumpy road.
>
> In this regard, let me stress this resolution of inquiry is of a fact-finding nature. It looks to the basis of the policy without having the effect of changing administration commitments. Nothing, in other words, in this approach jeopardizes the stabilization package itself. . . .
>
> There also should be no doubt that if the U.S. Government had failed to act, an international economic crisis could have been precipitated which would have had extraordinary job loss consequences in America and around the world.[6]

The Banking Committee also presented to the House a report on Resolution 80. The report contained a paragraph setting forth language almost identical to the portion of Representative Leach's floor statement concerning the obligation of Congress to review this matter, and it then stated:

---

[4] 141 Cong. Rec. 6408 (1995) (quoting heading in Congressional Record).

[5] *Id.*

[6] *Id.* at 6410.

It is in the context of the paragraph above that the request for documents contained in this resolution should be interpreted. But the scope of this request for documents should not be construed to include drafts of documents provided in final form, nor any notes of any individual.

The Committee further notes that under the rules and precedents of the House, requests for ongoing reports concerning actions taken through the ESF and international financial institutions are outside the scope of this resolution of inquiry.[7]

The Administration promptly began to search for documents responsive to the Resolution. On March 21, Abner Mikva, Counsel to the President, met with Representative Leach and Representative Christopher Cox to discuss the status of the Administration's response, and then reported on that status in a letter of the same day to Speaker Gingrich. Judge Mikva's letter explained that the extreme breadth and scope of the document requests and the need to review documents to determine whether it was consistent with the public interest to produce them to the entire House had made it impossible to meet the fourteen day deadline set forth in the Resolution. The letter indicated that the Administration would attempt to complete its response to the Resolution by May 15, and that in the meantime the Treasury Department would immediately make available to the House documents that had been provided to the Senate,[8] the Administration would produce other documents on a "rolling production" basis, and the Administration would work with the Banking Committee "to reach any appropriate agreements and accommodations with respect to responsive documents that are classified or otherwise subject to applicable privileges."[9]

The Treasury Department made available to the House the next day, March 22, the documents that had previously been made available to the Senate, and it and the other agencies proceeded to implement the rest of the response plan outlined by Judge Mikva. However, the Administration subsequently was informed by representatives of the House that the May 15 target date for completion of the response to Resolution 80 was unacceptable and that completion by April 7 was desired so that House staff could review the documents during the three-week congressional recess scheduled to begin that day. Responding to this statement of the House's needs, representatives of the Treasury and Justice Depart-

---

[7] H.R. Rep. No. 104–53, at 5 (1995).

[8] The Treasury Department had been providing documents to the Senate in response to two requests received earlier in the year. *See* Letter for the Honorable Robert Rubin, Secretary of the Treasury, from Senators Connie Mack, Trent Lott, Spencer Abraham, and Bob Dole (Jan. 26, 1995); Letter for the Honorable Robert Rubin, Secretary of the Treasury, from Senator Alfonse D'Amato, Chairman, Committee on Banking, Housing, and Urban Affairs (Feb. 17, 1995).

[9] Letter for the Honorable Newt Gingrich, Speaker of the House of Representatives, from Abner J. Mikva, Counsel to the President at 2 (Mar. 21, 1995). A copy of this letter was sent to Representatives Leach and Cox.

ments met with Banking Committee staff on April 3 and informed them that the Administration expected that it would be able to make all responsive documents available by April 7, except for those confidential documents for which by that date it would have requested a dialogue concerning possible accommodations.

The Administration representatives also informed Banking Committee staff on April 3 of the procedures that were being followed in an effort to complete the response to Resolution 80 within a time frame that would satisfy the House's needs. These procedures were confirmed in an April 5 letter from the Treasury Department to the Banking Committee, and subsequently restated in letters during the week of April 10 from the various responding agencies informing the House that they had completed their responses. These procedures delimited the scope of the search for responsive documents. In accordance with the Banking Committee Report on Resolution 80, certain drafts and notes were not considered responsive. Since there was no beginning date specified in the Resolution, and searching for archived documents in warehouses and elsewhere would have taken far more time than the House's needs would allow, agencies generally searched only for recent files (for example, Treasury searched back to January 1, 1994). Only the agencies that were likely to have worked on the Mexico matter or to have responsive files were asked to conduct searches. Finally, given the extraordinary difficulty, time, and expense involved in searching computer backups and other computer records, only hard-copy files were searched. The Banking Committee staff raised no objection to these procedures when they were identified at the April 3 meeting, and no objection was conveyed by any representative of the House at any time before the Administration completed its response on April 14.

As the Administration was working to respond to Resolution 80, a bill concerning the use of the ESF was introduced as an amendment to the Emergency Supplemental Appropriations and Rescissions Act, H.R. 889, 104th Cong. (1995). As introduced in the Senate on March 16, H.R. 889 required the President to provide periodic reports to Congress regarding the current state of the Mexican economy, measures taken by the Mexican government to safeguard the stability of the economy, and any U.S. government assistance provided to Mexico. In addition, it required that, before extending additional assistance to Mexico, the President certify to the appropriate congressional committees that:

(1) there is no projected cost to the United States from the proposed loan, credit, guarantee, or currency swap;

(2) all loans, credits, guarantees, and currency swaps are adequately collateralized to ensure that United States funds will be repaid;

(3) The Government of Mexico has undertaken effective efforts to establish an independent central bank or an independent currency control mechanism; and

(4) Mexico has in effect a significant economic reform effort.[10]

H.R. 889, providing $3.04 billion in new funding for the Department of Defense, was considered by a House and Senate Conference Committee in closed session. When it emerged from conference on April 6, the bill contained an additional requirement that the President certify that:

(5) the President has provided the documents described in paragraphs (1) through (28) of House Resolution 80, adopted March 1, 1995.[11]

The bill also contained the following new subsection:

(b) TREATMENT OF CLASSIFIED OR PRIVILEGED MATE-RIAL — For purposes of the certification required by subsection (a)(5), the President shall specify, in the case of any document that is classified or subject to applicable privileges, that, while such document may not have been produced to the House of Representatives, in lieu thereof it has been produced to specified Members of Congress or their designees by mutual agreement among the President, the Speaker of the House, and the chairmen and ranking members of the Committee on Banking and Financial Services, the Committee on International Relations, and the Permanent Select Committee on Intelligence of the House.[12]

During the limited post-conference floor debate on the portion of the bill dealing with the ESF, Representative Marcy Kaptur, who had introduced Resolution 80, began by complaining that the documents requested by the Resolution had not yet been turned over to the House. She characterized the bill as follows:

Essentially what it says is that no money, loan credit guarantee or arrangement through the [ESF] or the Federal Reserve can be extended unless the President of the United States has provided us with every single document that we have asked for in our resolution of inquiry.[13]

---

[10] 141 Cong. Rec. 8200 (1995).

[11] H.R. Conf. Rep. No. 104–101, at 19 (1995).

[12] *Id.* There were also minor revisions made to the wording of the original four certification requirements.

[13] 141 Cong. Rec. 10,672 (1995).

Representative Bob Livingston followed by noting that ''[w]e have compelled the White House to provide documentation which has not been forthcoming to date despite a resolution passed by this House on March 1.'' [14] Representative Sonny Callahan concluded the debate:

> The agreement we have reached with the Senate requires the Presi-
> dent to provide the information on the Mexican debt crisis called
> for in House Resolution 80. . . . The bill language does not cut
> off aid to Mexico. It does, however, require the President to provide
> the information requested in House Resolution 80, prior to the ex-
> tension of additional aid to Mexico.[15]

The bill was passed by both the House and Senate on April 6 as part of the Emergency Supplemental Appropriations and Rescissions for the Department of Defense to Preserve and Enhance Military Readiness Act of 1995, Pub. L. No. 104–6, 109 Stat. 73. Section 406 of title IV, the Mexican Debt Disclosure Act of 1995, imposed the presidential certification requirement. On April 7, Congress left for recess, to return on May 1.

As Congress was completing its work on the Mexican Debt Disclosure Act, the White House and the Justice Department were informed by the Treasury De-partment that additional assistance for Mexico pursuant to the terms of the U.S.– Mexico Agreements was due to be provided the week of April 17, and that, due to market exigencies, the disbursement could not be delayed. Accordingly, the Administration proceeded to complete its response to Resolution 80 and the Mexi-can Debt Disclosure Act by April 14. All of the agencies that had conducted document searches in response to the Resolution sent letters to the Speaker of the House during the week of April 10, advising that they had completed their searches and had made available to the entire House all documents except those for which it would be inconsistent with the public interest to provide to the entire House. The only documents withheld under the public interest exception were: (1) documents withheld by the White House reflecting confidential communica-tions between the President and foreign leaders; (2) documents withheld by the White House revealing White House deliberations; and (3) Central Intelligence Agency documents withheld by the CIA that constituted daily briefings for the President or records of meetings at the National Security Council or with senior White House staff.[16]

---

[14] *Id.*

[15] *Id.* at 10,674.

[16] *See* Letter for the Honorable Newt Gingrich, Speaker of the House of Representatives, from Abner J. Mikva, Counsel to the President (Apr. 14, 1995), Letter for the Honorable Newt Gingrich, Speaker of the House of Represent-atives, from Leo Hazlewood, Executive Director, Central Intelligence Agency (Apr. 11, 1995).

On April 14 the President issued a certification in the form of a Memorandum to the Secretary of the Treasury published in the Federal Register.[17] In relevant part, the President certified that:

> The Executive Branch has provided the documents requested by House Resolution 80 adopted March 1, 1995, and described in paragraphs (1) through (28) of that Resolution. All documents identified as responsive to the Resolution have been provided to the entire House of Representatives. Pursuant to the terms of the Resolution, the Executive Branch has not provided those documents as to which the Executive Branch has informed the House that it would be inconsistent with the public interest to provide the documents to the House. Pending arrangements for safekeeping of classified material in a House facility, classified documents have been provided to the House by making them available at Executive Branch facilities. Each agency, including the Federal Reserve Board, has advised the House of the procedures employed by that agency to provide the documents requested by House Resolution 80.[18]

In issuing the certification regarding the production of documents, the President relied on advice from the Counsel to the President and this Office. By letter to the Counsel to the President on April 14, we advised that the draft presidential certification submitted to this Office for review was a legally sufficient formulation of the certification required by section 406(a)(5). We advised that the certification requirement was properly interpreted as incorporating the "public interest" exception provided by Resolution 80. We further advised the White House that making classified documents available to House members at executive branch facilities pending arrangements for safekeeping in a House facility satisfied the requirement that the documents be "provided" to the House.[19]

A currency swap was executed according to the terms of the U.S.–Mexico Agreements on April 19.[20]

After Congress returned from its recess, the Administration and House Members and staff undertook to negotiate an agreement regarding the small number of White House documents withheld under the public interest exception. An agreement was ultimately reached.

---

[17] 3 C.F.R. 472 (1996).

[18] *Id.* at 472–73.

[19] Letter for the Honorable Abner J. Mikva, Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Apr. 14, 1995) ("April 14 Letter").

[20] Additional currency swaps were executed on May 19 and July 5, 1995.

## II.

As we stated in our April 14 Letter, the President's certification regarding the production of certain documents in connection with the use of the ESF was legally sufficient. Subsequently, however, five Republican House Committee Chairs questioned our interpretation of the Act.[21] Those Members relied on a memorandum from the General Counsel of the House of Representatives.[22] In view of the Members' objections, we take this opportunity to set forth in greater detail the basis for our advice to the President on April 14.

The essence of the argument presented in the House Counsel Memorandum is that section 406(a)(5) of the Act incorporates only the terms of paragraphs 1–28 of House Resolution 80 and, thus, does not include an exception for those documents that it would not be in the public interest to disclose. This interpretation is not the better reading of the statutory text and is refuted by the relevant legislative history, by traditional principles of statutory construction, and by long-accepted constitutional principles.

## A.

The fifth certification requirement states that, as a condition of extending further financial assistance to Mexico, the President must certify that he "has provided the documents described in paragraphs (1) through (28) of House Resolution 80, adopted March 1, 1995." House Counsel argues that section 406(a)(5) incorporates only paragraphs 1–28, and not the public interest exception and other language contained in the initial paragraph. However, as we stated in our April 14 Letter, "[a]lthough the statute cites only to the numbered paragraphs of House Resolution 80, it must be read as also incorporating the initial, unnumbered paragraph of the Resolution." [23] Our conclusion was compelled by the following considerations.

1. It is necessary to read section 406(a)(5) as incorporating the initial, unnumbered paragraph of the Resolution because that paragraph, and only that paragraph, makes clear that the President is to make available all responsive documents "in the possession of the executive branch" as a whole. House Counsel states that such an incorporation is unnecessary because any other reading of the statute

---

[21] Letter for the Honorable William J. Clinton, President of the United States, from Rep. Larry Combest, Chairman, Permanent Select Committee on Intelligence; Rep. Benjamin A. Gilman, Chairman, International Relations Committee, Rep. Henry J. Hyde, Chairman, Judiciary Committee, Rep. James Leach, Chairman, Banking and Financial Services Committee; Rep. Bob Livingston, Chairman, Appropriations Committee (June 28, 1995) ("Members' Letter").

[22] Memorandum for the Honorable Newt Gingrich, Speaker of the House of Representatives, from Cheryl A. Lau, General Counsel, Office of the Clerk, House of Representatives, and Barbara K. Bracher, Principal Assistant and Solicitor (May 30, 1995) ("House Counsel Memorandum").

[23] April 14 letter at 2.

would be "plainly ludicrous." [24] However, House Counsel mistakenly identifies the only alternative interpretation as a requirement that the President certify that he had produced any responsive document "in existence anywhere." [25] House Counsel overlooks the fact that only by reading section 406 in light of the initial paragraph of the Resolution can one determine that the documents named in the certification requirement were not limited to *White House* documents alone. House Counsel's interpretation would render meaningless the decision of the House Banking Committee to modify the Resolution to include the reference to the executive branch.[26] Thus, House Counsel is wrong in viewing section 406(a)(5) as in itself "clearly and unambiguously identify[ing] the 'universe of documents' subject to the President's certification." [27]

2. It is necessary to refer to the initial paragraph of Resolution 80 to know to whom the documents were to be provided. Although section 406(b) refers to documents that have not been produced to the House, this reference assumes a prior instruction that the documents were to be delivered to that body. Again, this information is not inconsequential; it makes clear that (subject to the exception in subsection (b)) the documents were to be provided to the full House, rather than to certain House committees or to both houses of Congress.

3. It is necessary to go beyond the four corners of paragraphs 1–28 of Resolution 80 in order reasonably to limit the scope of the obligation imposed by the certification requirement. Without such limitations it would have been impossible to satisfy the requirement quickly enough to meet the needs of the House, and, moreover, not in time to provide the needed assistance to Mexico. For example, section 406(a)(5) does not define the universe of documents in terms of the time period covered by the document request. Thus, without resorting to certain understandings extrinsic to the numbered paragraphs, section 406(a)(5) would require the Administration to locate and produce documents created from the beginning of the federal government's recordkeeping. For certain of the document requests, this would not have been difficult. For others — e.g., "any document concerning the condition of the Mexican economy" — this would have been impossible to do in a timely manner. The House had not objected when the Administration had indicated in responding to the Resolution that to meet the House's time schedule it was generally limiting its search to recent files.

---

[24] House Counsel Memorandum at 6.

[25] *Id.* at 6 n.7.

[26] The initial paragraph originally read as follows:

> Resolved, That the President is hereby requested to provide to the House of Representatives, not later than 14 days after the adoption of this resolution, the following documents.

41 Cong. Rec. 6408 (1995). When it was reported to the full House by the Banking Committee, the paragraph had been amended to read:

> That the President is hereby requested to provide to the House of Representatives (consistent with the rules of such House), not later than 14 days after the adoption of this resolution, the following documents *in the possession of the executive branch,* if not inconsistent with the public interest:

*Id.* at 6409 (emphasis added).

[27] House Counsel Memorandum at 5.

4. If going outside the twenty-eight paragraphs were precluded and the certification requirement were to be construed in such a way as to make it impossible to satisfy within any realistic time frame, then section 406(a)(5) would operate as a deliberate termination of the Mexico assistance program. However, there is no hint in the limited legislative history that this was what Congress accomplished or intended.[28] This is not surprising given that if Congress did so, it would be compelling the President to fail to honor a commitment he had made, pursuant to statutory authority, to a foreign sovereign. It would be extraordinary for Congress to impose such a requirement on the President without any debate or consideration.

5. There is scant legislative history available to shed light on section 406(a)(5). What does exist supports the interpretation that section 406(a)(5) was intended to require the President to certify that he had provided the set of documents sought by Resolution 80 in its entirety, which did not seek those documents that in the President's judgment it would be contrary to the public interest to disclose. The supporters of section 406(a)(5) identified the section's scope and purpose in terms of obtaining the documents sought by Resolution 80.

Representative Kaptur described the bill as follows: "Essentially what it says is that no money, loan credit guarantee or arrangement through the [ESF] or the Federal Reserve can be extended unless the President of the United States has provided us with every single document *that we have asked for in our resolution of inquiry.*"[29] Representative Livingston stated: "We have compelled the White House to provide documentation which has not been forthcoming to date despite a resolution passed by this House on March 1."[30] Representative Callahan concluded the debate: "The agreement we have reached with the Senate requires the President to provide *the information* on the Mexican debt crisis *called for in House Resolution 80.*"[31]

These statements contradict House Counsel's assertion that this Office's construction of the Act and its legislative history is "untenable." Indeed, the House Counsel Memorandum itself notes that "[t]hese new provisions were designed to resolve the document dispute by making the continuation of the President's Mexican aid program contingent upon the production of *the documents sought by the precatory Resolution of Inquiry and the oversight committee.*"[32]

---

[28] Indeed, Representative Kaptur, the sponsor of Resolution 80, stated during the floor debate on section 406 that the provision got the House to "second base" in terms of serious oversight of the expenditure of funds. She had said when introducing the Resolution that she had been seeking a "home run" of an actual House vote on the assistance program, but since the House leadership blocked that, she had settled for the "single" represented by the Resolution's request for documents. 141 Cong. Rec. at 10,672. The clear implication of her statement, of course, is that the vote on section 406 was not a vote on terminating the assistance program. *See also id.* at 10,674 (statement of Rep. Callahan) ("The bill language does not cut off aid to Mexico.").

[29] 141 Cong. Rec. at 10,672 (emphasis added).

[30] *Id.*

[31] *Id.* at 10,674 (emphasis added).

[32] House Counsel Memorandum at 9 (emphasis added).

6. According to House Counsel, instead of merely requiring the President to comply with Resolution 80 before providing additional assistance to Mexico, section 406 actually *expanded* the scope of the documents being sought by the House by requiring the inclusion of documents that, in the President's judgment, it would not be in the public interest to provide. Nothing in the text or legislative history of the statute supports such a conclusion. The text of section 406 defines the documents at issue by reference to Resolution 80 without any indication of an intent to go beyond the requirements of the Resolution. Indeed, the reference in section 406(b) to documents that "may not have been produced to the House of Representatives" reflects the existence of authority to withhold documents from the House. However, in the view of House Counsel, although the House had authorized the President to protect the public interest in complying with its request, the Congress withdrew that authorization *sub silentio*. We find such a conclusion implausible.

Additionally, the legislative history of section 406 fails to reveal any intent or even interest in expanding the scope of the documents sought by Resolution 80. Instead, as we noted above, in all of the relevant legislative history, section 406 is described as merely enforcing the existing request, and not as expanding the request by deleting authority to protect the public interest. It would be remarkable for such a critical change to go unremarked in the legislative history.

7. Finally, as discussed more fully below, it was necessary to construe the statute to incorporate the initial paragraph of Resolution 80 because any other reading would fail to preserve the President's constitutional authority and responsibility to preserve the absolute confidentiality of documents the disclosure of which would be contrary to the public interest.[33] Section 406(b) concerns the "treatment of classified or privileged material." Under House Counsel's reading of section 406(b), all such material, if not provided to the full House, would have to "be produced to specified Members of Congress or their designees." [34] In other words, House Counsel would interpret section 406 to require the President either to dishonor the United States' commitment to Mexico, thereby posing a threat that Mexico would default and jeopardize important U.S. interests, or to divulge all documents, even highly sensitive documents reflecting diplomatic negotiations, to at least some Members of Congress as a condition of aid to Mexico. Such an interpretation creates serious doubts about the statute's constitutionality.

A paramount rule of statutory construction thus stands as an obstacle to House Counsel's interpretation. As the Supreme Court has repeatedly cautioned, "[w]hen the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which

---

[33] *See United States v. Nixon*, 418 U.S. 683 (1974); Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* (Dec. 21, 1989).

[34] House Counsel Memorandum at 7.

the question may be avoided.''[35] Absent clear evidence of Congress's contrary intent, a court will adopt a reasonable construction of a statute to avoid reaching a serious constitutional problem.[36] The practice of the executive branch is and should be the same. As just discussed, there was no such clear evidence of contrary congressional intent.

## B.

In summary, we believe our construction of section 406 is correct, and we reject the alternative put forward by House Counsel. The fundamental premise of House Counsel's reading is that paragraphs 1–28 of House Resolution 80 should be interpreted without recourse to the initial paragraph of the Resolution. As we have shown, however, this premise is erroneous. In order to give a plausible reading to section 406, it is necessary to go outside the four corners of paragraphs 1–28. It is clear that the initial paragraph of House Resolution 80 — in which the House itself set forth its understanding of its request but which the House Counsel treats as superfluous — is an appropriate source of clarification. The admittedly scanty legislative history of section 406 confirms what would have seemed obvious in any case, that certification requirement five was intended to obtain executive branch compliance with House Resolution 80, and not to broaden the scope of the House's request. At the same time, the legislative history is devoid of any suggestion that Congress intended for section 406 to present the President with a choice between violating the President's own obligations to the Constitution or failing to honor a commitment to a foreign sovereign and placing important U.S. interests at risk. Finally, our interpretation of section 406, unlike the alternative, provides a reasonable way to give effect to the statutory language while avoiding the creation of a serious question about the constitutionality of the section. We now turn to explain more fully the constitutional issues.

## III.

Were House Counsel correct in defining the scope of the document production needed to satisfy that requirement, then section 406 would be an invalid intrusion into the President's constitutional authority. According to House Counsel, section 406

---

[35] *Crowell v. Benson*, 285 U.S. 22, 62 (1932); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court.").

[36] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *Public Citizen v. Department of Justice*, 491 U.S 440, 466 (1989) (The Supreme Court is "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils.").

is not a document request, but a statement of the conditions under which the Administration's financial assistance to Mexico may proceed. It sets forth conditions for the exercise of executive authority. The President may choose not to supply the documents identified in the Act. But then the President may not exercise the authority for which the production of documents is the condition precedent.[37]

While it is true that section 406 is not in itself a request for documents, it specifically refers in terms to House Resolution 80, which *was* a document request, and it requires the President, as a condition of furnishing further financial assistance to Mexico, to certify that he has provided certain documents.

Broad as the spending power of the legislative branch undoubtedly is, it is clear that Congress may not deploy it to accomplish unconstitutional ends.[38] Thus, as this Office has repeatedly affirmed, and as we discuss more fully below, Congress may not use the spending power to infringe on the President's constitutional authority. In particular, "Congress may not use its power over appropriation of public funds ' "to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs." ' " *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18, 28 (1992) (Asst. Att'y Gen. Flanigan) (quoting *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 42 n.3 (1990) (Asst. Att'y Gen. Barr), (quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989) (Asst. Att'y Gen. Barr))). Moreover, "the conduct of affairs committed exclusively to the President by the Constitution must be carefully insulated from improper congressional interference in the guise of 'oversight' activities. . . . [W]hile Congress unquestionably possesses the power to make decisions as to the appropriation of public funds, it may not attach conditions to Executive Branch appropriations that require the President to relinquish any of his constitutional discretion in foreign affairs." *The President's Compliance with the "Timely Noti-*

---

[37] House Counsel Memorandum at 4–5.

[38] *See, e.g., United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872) (appropriations act unconstitutionally intruded on President's pardon power); *United States v. Lovett*, 328 U.S. 303, 316 (1946) (Congress may not employ its appropriations power to impose bill of attainder); cf. *Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 594 (1926) (state legislature cannot affix unconstitutional condition to a privilege that it may deny); *Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 271 (1991) (Congress may not use its authority over federal property to achieve ends by indirect means that it cannot accomplish directly); *see also Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955) (Att'y Gen. Brownell) ("If the practice of attaching invalid conditions to legislative enactments were permissible, it is evident that the constitutional system of the separability of the branches of Government would be placed in gravest jeopardy."); *Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 61 (1933) (Att'y Gen. Mitchell) ("This proviso can not be sustained on the theory that it is a proper condition attached to an appropriation. Congress holds the purse strings, and it may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted and impose conditions in respect to its use, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution.").

*fication'' Requirements of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159, 169–70 (1986) (Asst. Att'y Gen. Cooper).[39]

## A.

As then-Assistant Attorney General William Barr noted, "Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control." [40] It is, of course, well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States. This authority flows, in large part, from the President's position as Chief Executive, U.S. Const. art. II, § 1, cl. 1, and as Commander in Chief, *id.* art. II, § 2, cl. 1. It also derives from the President's more specific powers to "make Treaties," *id.* art. II, § 2, cl. 2; to "appoint Ambassadors . . . and Consuls," *id.*; and to "receive Ambassadors and other public Ministers," *id.* art. II, § 3. The Supreme Court has repeatedly recognized the President's constitutional authority with respect to the conduct of diplomatic relations.[41]

Interwoven with the President's constitutional authority to conduct diplomatic relations is his constitutional authority to determine whether to disclose the content of international negotiations: without such power, he could not ensure the con-

---

[39] *See also Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 126 (1995) (concluding that a bill, which would condition executive branch's ability to obligate appropriated funds upon locating U.S. embassy to Israel in Jerusalem, would unconstitutionally invade the President's constitutional authority to determine the form and manner of the Nation's diplomatic relations).

[40] Panel symposium on *The Appropriations Power and the Necessary and Proper Clause*, 68 Wash. U L.Q. 623, 628 (1990). So, for instance, the Supreme Court has prohibited Congress's use of its spending power to encroach on the exclusive power of the President to grant pardons. *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872). A century later, this Office construed an amendment to an appropriations act that prohibited the use of certain funds for salaries or expenses in connection with readmitting into the United States persons who had evaded the draft. This Office concluded that the statute, if construed broadly, would be an unconstitutional interference with the President's pardon power. Accordingly, we advised the Counsel to the President that the statute should be narrowly construed to avoid the constitutional infirmity. If the circumstances (unavailability of alternative funds) made that unworkable, then the President was advised to disregard the amendment as an unconstitutional condition attached to an appropriations act. Memorandum for the Honorable Robert J. Lipshutz, Counsel to the President, from John Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Myers Amendment* (Aug. 30, 1977); *see also Mutual Security Program — Cutoff of Funds From Office of Inspector General and Comptroller*, 41 Op. Att'y Gen. 507, 527 (1960) (Att'y Gen. Rogers) ("[T]he power of appropriation . . . is far-reaching in scope, and the objects of appropriation are also subject to the broad discretion of Congress. But the power to appropriate . . cannot be exercised without regard to constitutional limitation."); *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469–70 (1860) (concluding that appropriations bill that contained condition that the money be spent only under the supervision of a particular person designated for appointment by Congress was invalid encroachment upon presidential authority and should be treated "as if the paper on which it is written were blank.").

[41] *See, e.g., Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive'" (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981))); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705–06 n.18 (1976) (opinion of White, J.) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch."); *United States v. Louisiana*, 363 U.S. 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations"); *see also Ward v. Skinner*, 943 F.2d 157, 160 (1st Cir. 1991) (Breyer, C.J.) ("[T]he Constitution makes the Executive Branch . . . primarily responsible" for the exercise of "the foreign affairs power."), *cert. denied*, 503 U.S. 959 (1992); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 210 (D.C. Cir. 1985) (Scalia, J.) ("[B]road leeway" is "traditionally accorded the Executive in matters of foreign affairs."); Charles J. Cooper, panel symposium on *What the Constitution Means by Executive Power*, 43 U. Miami L. Rev. 165, 177 (1988) ("[T]he conduct of foreign affairs is an aspect of the executive power entrusted to the President, subject only to narrowly defined exceptions.").

fidentiality and secrecy that are essential elements of diplomacy. "[I]t is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy. Other nations can hardly deal with this Nation in an atmosphere of mutual trust unless they can be assured that their confidences will be kept. And within our own executive departments, the development of considered and intelligent international policies would be impossible if those charged with their formulation could not communicate with each other freely, frankly, and in confidence." [42] As precedent and continuing practice firmly establish, "[t]he conduct of international negotiations is a function committed to the President by the Constitution," and "he must have the authority to determine what information about such international negotiations may, in the public interest, be made available to Congress and when such disclosure should occur." [43] The President therefore possesses, as a matter of constitutional law, the authority to exercise independent judgment about whether it is in the public interest to disclose such information to Congress. [44] The President's authority to control the release of diplomatic communication does not terminate when the negotiations conclude. [45]

On the interpretation of section 406 advocated by House Counsel, however, Congress would be attempting to compel the President to disclose the contents of international negotiations of a highly sensitive and confidential nature (including direct correspondence between one Head of State and another) as a condition of honoring a commitment made by the President, acting pursuant to statutory authority, to furnish financial aid in the midst of an international currency crisis. Such a constraint on the President's authority would "deprive the President of

---

[42] *New York Times Co. v. United States,* 403 U.S. 713, 728 (1971) (Stewart, J., concurring). As the Senate Foreign Relations Committee stated in 1816, in recognizing limits on its authority to demand documents related to diplomatic matters from the President, "[t]he nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends upon secrecy and dispatch." *United States v. Curtiss-Wright Export Corp.* 299 U.S. 304, 319 (1936) (quoting *Compilation of Reports of the Committee on Foreign Relations, United States Senate, 1789–1901,* S. Doc. No. 56–231, pt. 8, at 24 (1901)); *see also* Charles J. Cooper and Leonard A. Leo, *Executive Power Over Foreign and Military Policy: Some Remarks on the Founders' Perspective,* 17 Okla. City U. L. Rev. 265, 274 (1991) ("*The Federalist No. 75* . . . recognize[ed] the importance of presidential autonomy in . . . negotiations — so that he may 'enjoy the confidence and respect of foreign powers' and 'act with an equal degree of weight of efficacy.' " (quoting *The Federalist No. 75* at 487 (Alexander Hamilton) (E. Earle ed. 1937))).

[43] 14 Op. O.L.C. at 43. In that opinion, this Office concluded that a condition contained in a statute authorizing funds for international conferences that required the President to include certain individuals as U.S. Representatives in the negotiating delegation was unconstitutional. *See also The Disclosure of Documents to the House Committee on Government Operations — Boycotts — Export Administration Act,* 1 Op. O.L.C. 269, 270 (1977) (Asst. Att'y Gen. Harmon) (concluding that the executive branch may, as a matter of constitutional law, refuse to provide to Congress documents reflecting confidential communication and notes of meetings with foreign government officials, where the disclosure of documents could "impair our relations with the foreign governments involved, both by breaching a pledge of confidentiality and by releasing information possibly detrimental to the interests of the other governments," the documents could properly be considered "state secrets"); Memorandum from John R. Stevenson, Legal Adviser, Department of State, and William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969) ("[T]he President has the power to withhold from the Senate information in the field of foreign relations or national security if in his judgment disclosure would be incompatible with the public interest.").

[44] 1 Op. O.L.C. at 269, 272.

[45] *See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320–21 (1936); 14 Op. O.L.C. at 44 n.6, 13 Op. O.L.C. at 259; 10 Op. O.L.C. at 165 n.13. (Asst. Att'y Gen. Cooper).

his constitutionally-mandated control over the disclosure of the content of [foreign affairs] negotiations." [46] Congress, therefore, cannot directly or indirectly compel such a disclosure: it lacks the authority, whether in the exercise of its spending power or any other of its powers, to "inquire into matters which are within the exclusive province of one of the other branches of the Government." [47] Accordingly, section 406, if given the construction urged in the House Counsel Memorandum, would be invalid as an unconstitutional condition imposed on the President. [48]

## B.

The President's constitutional authority to control the disclosure of documents and information relating to diplomatic communications has been recognized since the beginning of the Republic. The issue first arose during the administration of President George Washington, and it was President Washington and the distinguished members of his cabinet who originally articulated the Executive's authority to withhold documents in the public interest. By its deliberations and actions, the Washington administration outlined a consistent account of the executive branch's independent power over diplomatic communications: (1) the Constitution delegates to the President the authority to withhold documents relating to diplomatic negotiations from Congress when disclosure would be, in his judgment, contrary to the public interest; (2) the President has discretion to disclose documents that he could have withheld when in his judgment it is appropriate to do so; and (3) it is appropriate whenever possible to construe congressional requests for information to avoid a conflict between the President's constitutional prerogative and congressional requirements. Subsequent Presidents have regularly adhered to Washington's views.

The earliest discussion of the question of presidential authority over disclosure appears to have been in response to a March 1792 resolution of the House of Representatives appointing a committee with the power to investigate the disastrous St. Clair expedition of the previous year. When the committee requested

---

[46] 14 Op. O.L.C. at 42.

[47] *Barenblatt v. United States*, 360 U.S. 109, 112 (1959)

[48] We do not mean to suggest that the President's constitutional authority over the disclosure of confidential executive branch documents is limited to the area of foreign affairs. A few years ago then-Assistant Attorney General Barr described "the President's constitutional right and duty to withhold from disclosure certain information" as including "information whose disclosure might significantly impair the conduct of foreign relations, the national security, the deliberative processes of the executive branch or the performance of its constitutional duties." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 254 (1989); *see also* Memorandum from President Harry S. Truman (Mar. 15, 1948), *reprinted in* H.R. Rep. No. 80-1595, at 8–10 (1948) (minority report) ("Truman Memorandum") ("Since the founding of the Government the Presidents of the United States have, from time to time, held information of various types to be confidential, and have refused to divulge or to permit the divulgence of such information outside of the executive branch of the Government."). For the purposes of this memorandum, however, it is unnecessary to examine the legal principles governing presidential control of this broader range of information: section 406 concerns documents with respect to which the President's authority is the most unequivocal and absolute. *See, e.g., Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 482–83 & n.3 (1982) (Asst. Att'y Gen. Olson).

that the Secretary of War provide it with relevant documents, President Washington asked the cabinet's advice as to his proper response "because [the request] was the first example, and he wished that so far as it should become a precedent, it should be rightly conducted." [49] Washington's own view was that "he could readily conceive of papers of so secret a nature, as that they ought not to be given up." [50] A few days later a unanimous cabinet — including Secretary of State Thomas Jefferson, Secretary of the Treasury Alexander Hamilton, and Attorney General Edmund Randolph — concurred. The cabinet advised the President that while the House "might call for papers generally," "the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public." [51] The Executive "consequently w[as] to exercise a discretion" in responding to the House request.[52]

Although the cabinet further advised President Washington that the documents in question could all be disclosed consistently with the public interest,[53] his and their conclusion that the House resolution could not compel disclosure against the President's judgment apparently was communicated to the House, which promptly substituted a new resolution asking only for papers "of a public nature," a request with which the President complied.[54] Just as Washington had anticipated, the St. Clair episode set an important precedent, in several respects. First, it produced agreement in a group including three of the most distinguished participants in the Philadelphia convention (Washington, Hamilton and Randolph) as well as between two of the most influential early interpreters of the Constitution (Hamilton and Jefferson) that the President possesses the authority to refuse to disclose documents respecting military and diplomatic matters to Congress when in his judgment to do so would be harmful. Second, the event was the first instance of the Executive construing a congressional document request in order to preserve executive branch prerogatives.[55] Finally, the House's substitute motion apparently

---

[49] 1 *Writings of Thomas Jefferson* 303 (Andrew Lipscomb ed. 1903) (The Anas).

[50] *Id.*

[51] *Id.* at 304.

[52] *Id.*

[53] *Id.* at 305.

[54] The substitute resolution acknowledged indirectly the President's asserted power to withhold documents, by defining the documents included in rather than those excepted from the scope of the House's request. *See* Abraham D. Sofaer, *War, Foreign Affairs and Constitutional Power* 82–83 (1976) ("Sofaer") (concluding that the "far more reasonable construction" of the House's "somewhat ambiguous" language is that it meant "those papers that could properly or safely be made public"). Subsequent congressional requests to the President have generally included direct acknowledgments of the President's authority not to disclose.

[55] Although the House committee had demanded the originals of the relevant documents, the cabinet opined that "copies only should be sent, with an assurance" that the Executive would permit verification of the copies' accuracy if desired. 1 *Writings of Thomas Jefferson* at 305. A majority of the cabinet, furthermore, advised Washington that such document requests should properly come from the full House to the President rather than from a committee to his subordinate, *id.* at 304, a view apparently accepted by the House in its substitute resolution. *See* Sofaer, *supra* at 82.

began the long history of congressional acquiescence in the Executive's assertion of discretionary authority over disclosure.[56]

President Washington adhered to the conclusions reached in 1792 in later confrontations with Congress. In January 1794, the Senate requested the President to provide it with "the correspondences which have been had" between the Republic of France and the United States minister to France, as well as between the minister and the Secretary of State; the resolution was entirely unqualified. Once again, Washington's cabinet advised the President unanimously that he need not and should not disclose documents against his judgment of the public interest.[57] In a separate written opinion, Attorney General William Bradford agreed: "[I]t is the duty of the Executive to withhold such parts of the said correspondence as in the judgment of the Executive shall be deemed unsafe and improper to be disclosed." [58] Bradford vigorously rejected the argument that the Senate's unqualified language precluded a construction of the resolution that would respect the President's authority over disclosure, authority that Bradford plainly rooted in the Constitution.[59] President Washington acted on this advice by providing the Senate with the correspondence except, as he explained in a cover letter, for "those particulars which, in my judgment, for public considerations, ought not to be communicated." [60]

The best known of President Washington's assertions of the Executive's authority over disclosures not in the public interest involved the controversial Jay Treaty and a resolution by the House requesting the correspondence and other documents relating to the Treaty. Although the resolution contained an explicit exception for

---

[56] *See* Sofaer, *supra* at 81–83. Perhaps the most serious congressional questioning of the President's constitutional authority occurred in 1948, when the House of Representatives considered a joint resolution intended to vest in a congressional committee the power to make determinations about disclosure of documents obtained from the executive branch. Opponents of the bill pointed out that its passage would violate the principle that "[u]nder the Constitution, the Executive is no less supreme in his field than is the Congress in its field of operation." H.R. Rep. No. 80–1595, at 10 (1948) (minority report). In addition, they argued, "the acquiescence by the Congress for over 150 years in the Executive prerogative of withholding from disclosure such information as the Executive deems must be withheld in the public interest is in itself conclusive proof that the prerogative is one which exists under, and is protected by, the Constitution." *Id.* The Resolution was not finally adopted.

[57] Secretary Hamilton agreed with Secretary of War Henry Knox that it would be best flatly to decline compliance, but reasoned that "the principle" of executive authority would be "safe, by excepting such parts as the President may choose to withhold." Cabinet Meeting Opinion on Communicating to the Senate the Dispatches of Gouverneur Morris, 15 *The Papers of Alexander Hamilton* 666, 667 (Harold C. Syrett ed., 1969). Randolph, now Secretary of State, advised the communication of "all the correspondence, proper from its nature to be communicated to the Senate," but agreed that "what the President thinks improper, should not be sent." *Id.*

[58] Memorandum for the President, from William Bradford, Attorney General (n.d.), *reprinted in* Walter Dellinger and H. Jefferson Powell, *The Attorney General's First Separation of Powers Opinion*, 13 Const. Commentary 309, 316 (1996).

[59] Bradford wrote that he also conceived

that the *general* terms of the resolve do not exclude, in the construction of it, those just exceptions which the rights of the executive and the nature of foreign correspondences require. Every call of this nature, where the correspondence is secret and no specific object pointed at, must be presumed to proceed upon the idea that the papers requested are proper to be communicated[;] & it could scarcely be supposed, even if the words were stronger[,] that the Senate intended to include any Letters[,] the disclosure of which might endanger national honour or individual safety.

*Id.*

[60] 4 Annals of Cong. 56 (1794); *see* Sofaer, *supra* at 83–85.

documents "improper to be disclosed," the President ultimately refused to comply:

> The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion, a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolite; for this might have a pernicious influence on future negotiations or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers.[61]

While Washington explained his rejection of any "right" on the House's part to demand "all the Papers respecting a negotiation with a foreign power," *id. in* 1 *Messages and Papers* at 195, with reference to the realities of foreign affairs, he grounded his position in his "obligation . . . to 'preserve, protect and defend the Constitution.' "[62]

## C.

We have not discussed the Washington era events at length out of mere antiquarian interest. Later Presidents have regularly followed Washington — and cited him — in combining assertions of their constitutional authority to withhold documents relating to diplomatic matters and of the propriety of interpreting congressional requests as respecting their constitutional prerogative with earnest attempts to accommodate Congress's interests.[63] The constitutional position originally for-

---

[61] Message of President George Washington to the House of Representatives (Mar. 30, 1796), *in* 1 *A Compilation of the Messages and Papers of the Presidents 1789–1897*, at 194–95 (James D. Richardson ed., (1897)) ("*Messages and Papers*").

[62] *Id. in* 1 *Messages and Papers* at 194. In asserting the constitutional basis for his refusal to comply with the House request, Washington relied in part on the exclusion of the House from the treaty power. However, we believe that it is clear that Washington was in no way rejecting the position he had already taken — that the President might withhold documents when the public interest so required. *See* Sofaer *supra* at 93; Message of President James K. Polk to the House of Representatives (Jan. 12, 1848), *in* 4 *Messages and Papers* 565, 567 (relying on Washington's argument based on his authority to control the disclosure of diplomatic information while not "deeming it to be necessary on the present occasion to examine or decide upon the other reasons" given in Washington's message).

The Executive's responsibility for determining what part of the correspondence could be disclosed was also defended vigorously in the House. Even James Madison, who strongly insisted on the House of Representatives' general right to access to information, conceded the President's authority over disclosure. Madison told the House that the House "must have a right, in all cases, to ask for information which might assist in their deliberations on the subjects submitted to them by the Constitution; being responsible, nevertheless, for the propriety of the measure" but continued that he "was as ready to admit that the Executive had a right, under a due responsibility, also, to withhold information, when of a nature that did not permit a disclosure of it at the time." 5 Annals of Cong. 773 (1796).

[63] The traditional executive branch view of the 1796 message is that it is a powerful precedent for the Executive's long-standing constitutional view that Congress cannot legitimately deny the President the power to withhold documents when in his judgment the public interest requires such action. *See* Message of President James K. Polk to the House of Representatives (Jan. 12, 1848), *in* 4 *Messages and Papers* at 566–67; Message of President John Tyler to the House of Representatives (Jan. 31, 1843), *in* 4 *Messages and Papers* 220, 223; Truman Memorandum; *see also Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 48 (1941); 13 Op. O.L.C. at 259; 10 Op. O.L.C. at 165 n.13.

mulated by the Washington Administration has thus become the practice of the executive branch as an ongoing institution,[64] and the Attorneys General and the heads of this Office have consistently maintained that it is the correct interpretation of the respective powers of President and Congress.[65] The executive branch position has had vigorous defenders in the legislative branch as well,[66] and Congress has usually accepted the Executive's position as a practical matter.[67]

---

[64] William H. Taft, *The Presidency* 110 (1916) ("The executive has always insisted and maintained that, while either house may request information, it cannot compel it if the executive deems it to be inconsistent with the public weal to disclose what is asked."). President James K. Polk's response to an 1848 document request is particularly instructive. On January 4, 1848, the House passed a resolution calling on the President to provide the House with a broad range of documents concerning United States relations with Mexico, including communications to the United States minister to Mexico and to United States military officers. As President Polk noted in his response, "[t]he customary and usual reservation contained in calls of either House of Congress upon the Executive for information relating to our intercourse with foreign nations [was] omitted." Message of President James K. Polk to the House of Representatives (Jan. 12, 1848), *in* 4 *Messages and Papers* at 566. Despite the unqualified nature of the House resolution, Polk provided only those documents that he deemed it "compatible with the public interests to communicate," *id. in* 4 *Messages and Papers* at 565, citing constitutional principle and executive precedent:

> The call of the House is unconditional. It is that the information requested be communicated, and thereby made public, whether in the opinion of the Executive (who is charged by the Constitution with the duty of conducting negotiations with foreign powers) such information, when disclosed, would be prejudicial to the public interest or not. It has been a subject of serious deliberation with me whether I could, consistently with my constitutional duty and my sense of the public interests involved and to be affected by it, violate an important principle, always heretofore held sacred by my predecessors, as I should do by a compliance with the request of the House.

*Id. in* 4 *Messages and Papers* at 566. Polk discussed and relied on President Washington's 1796 refusal in concluding that it was his "constitutional right and solemn duty under the circumstances of this case to decline a compliance with the request of the House." *Id. in* 4 *Messages and Papers* at 567; *see also* 94 Cong. Rec. 5711 (1948) (statement of Rep. McCormick) (identifying seventeen different administrations in which by 1948 the executive branch had declined to comply with congressional requests for information or documents).

[65] *See e.g., Mutual Security Program — Cutoff of Funds From Office of Inspector General and Comptroller*, 41 Op. Att'y Gen. 507 (1960); *The Disclosure of Documents to the House Committee on Government Operations — Boycotts — Export Administration Act*, 1 Op. O.L.C. 269 (1977).

[66] Senator Howell Edmunds Jackson's 1886 speech in response to President Cleveland's refusal to provide certain documents is illustrative. Jackson noted that the question

> as to how far the executive department of the Government should respond to the calls of the House and Senate for papers . . . came up as early as 1792, and from that time to this it has been uniformly held both by the executive and judicial departments of the Government that it rested in the discretion of the Executive as to what papers he would produce in response to calls by the Legislature or the courts.

17 Cong. Rec. 2622 (1886). As the Senate Foreign Relations Committee stated in 1816, in recognizing the limits on its authority to interfere in diplomatic matters, "[t]he nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends upon secrecy and dispatch." *Compilation of Reports of the Committee on Foreign Relations, United States Senate, 1789–1901*, S. Doc. No. 56–231, pt. 8, at 24 (1901), *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (describing Washington's refusal to comply with the House request in 1796 — "a refusal the wisdom of which was recognized by the House itself and has never since been doubted").

In 1826, Representative Daniel Webster objected to an appropriations rider that purported to attach instructions to United States diplomats whom the President proposed to send to an international conference. Webster argued vigorously that the rider was "unconstitutional; as it was taking the proper responsibility from the Executive and exercising, ourselves, a power which, from its nature, belongs to the Executive and not to us." *See* Eli E. Nobleman, *Financial Aspects of Congressional Participation in Foreign Relations*, 289 Annals Am. Acad. Pol. & Soc. Sci. 145, 150 (1953).

[67] The most persuasive evidence of congressional recognition of the force of the executive branch position may be the long-standing practice of including the public interest exception in resolutions requesting information. As noted in the minority report accompanying the Truman Memorandum,

> The unwisdom of our attempting at this time to enforce this asserted congressional 'right' of doubtful constitutionality [to demand information that the executive branch deems is not in the public interest to disclose] when 79 Congresses which have gone before us have seen fit not to attempt such enforcement

Continued

The more recent doctrine and practice of the executive branch demonstrate the continuing vitality of the President's constitutional authority to control the disclosure of diplomatic communications, even in the face of an effort by Congress to condition funding on the making of those disclosures. In 1960, Attorney General William Rogers advised President Eisenhower regarding a provision of a statute that directed that certain expenses of a State Department office be charged to certain appropriations, provided that all documents relating to activities of that office were furnished upon request to Congress.[68] A related statute provided for termination of funds if all documents were not produced, unless the President certified that he had forbidden the disclosure of the documents to protect the public interest. The State Department refused to furnish a number of documents requested by a House subcommittee, and the President certified that he had forbidden their disclosure. The Comptroller General, interpreting the former statute as not incorporating the public interest exception, directed that funds not be made available to liquidate obligations incurred from the following day forward. Attorney General Rogers concluded that the statute should be construed to include the public interest exception because otherwise the statute, as applied under the circumstances, would embody an unconstitutional condition:

> First, it is the constitutional duty and right of the President and those officials acting pursuant to his instructions, to withhold information of the executive branch from Congress whenever the President determines that it is not in the public interest to disclose such information.
>
> Second, under the constitutional doctrine of separation of powers Congress may not directly encroach upon the authority confided to the President.
>
> Third, the Constitution does not permit any indirect encroachment by Congress upon this authority of the President through resort to

---

is self-evident. Not only that, but also the acquiescence by the Congress for over 150 years in the Executive prerogative of withholding from disclosure such information as the Executive deems must be withheld in the public interest is in itself conclusive proof that that prerogative is one which exists under, and is protected by our Constitution and that the 'right' of the Congress which House Joint Resolution 342 would enforce has no constitutional basis.

H.R. Rep. No. 80-1595, at 10 (1948).

To be sure, the Houses of Congress have rarely conceded unequivocally that the exception is constitutionally required. This is hardly surprising: Congress is subject to strong "hydraulic pressures" to describe its powers in expansive terms and consequently minimize the independent authority of the Executive. *See INS v. Chadha*, 462 U.S. 919, 947, 951 (1983) (noting " 'propensity' " of the legislative branch " 'to invade the rights of the Executive' " (quoting *The Federalist No. 73*, at 442 (Alexander Hamilton) (Clinton Rossiter ed., 1961))).

[68] 41 Op. Att'y Gen. 507 (1960) (construing the Mutual Security Act of 1959, Pub. L. No. 86-108, sec. 401(b), § 533A, 73 Stat. 246, 253).

conditions attached to appropriations such as are contended to be contained in . . . the act.[69]

Thus, he concluded, in spite of the Comptroller General's letter announcing the termination of funds, the funds "continue to be available as heretofore." [70]

Similarly, in 1973, this Office issued an opinion regarding the constitutionality of a section of an authorizations act providing that no funds made available to the Department of State and related agencies may be obligated thirty-five days after delivery to the head of the agency of a request from certain congressional committees for documents, unless the agency has complied with the request.[71] The statute excepted only communications to and from the President personally. Thus, the statute precluded the President from exercising his constitutional authority "to prevent the disclosure to the Congress of information where in his judgment disclosure would be contrary to the public interest." [72] This Office concluded that the statute, if interpreted literally, would be an unconstitutional interference with the President's duty to refuse compliance with a congressional demand to disclose documents that may reveal state secrets. The opinion noted that the statute did not literally deny to the President the exercise of his authority to invoke executive privilege, but rather it would "as a practical matter" leave the President with "no choice." [73] The following analysis from that opinion is fully applicable to the present situation:

> The Department of Justice is not prepared to take the position that in every instance legislation would be unconstitutional that might operate to interfere with the free exercise of the President's discretion as to whether or not he shall invoke the privilege. . . . Congress may refuse to pass needed legislation, or the Senate may withhold its advice and consent to a treaty, or to the appointment of an officer, if it is denied requested information. Legislation that would provide for similar limited restraints on the President's exercise of privilege therefore is not necessarily unconstitutional. That consideration, however, ceases to be operative where the penalty attached to the exercise of the privilege is such that as a practical matter the President has no choice but to comply with every Congressional demand no matter how injurious to the public interest

---

[69] *Id.* at 530 (footnote omitted).

[70] *Id.* at 531.

[71] Memorandum for the Honorable Leonard Garment, Counsel to the President, from Leon Ulman, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Section 13 of the State/USIA Authorization* (July 16, 1973).

[72] *Id.* at 1–2.

[73] *Id.* at 4.

> or unreasonable. The choice is transferred from the President to the Congress, without recourse.
>
> In our view, [the statute] falls into the latter category. By providing that the funds for an entire agency will be cut off should the President exercise his constitutional power it deprives the President of all choice. In other words, despite its wording, [the statute] is for all practical intent and purposes identical with legislation that would expressly deny to the President the exercise of a constitutional power. It is therefore in our judgment unconstitutional.[74]

Precipitously cutting off assistance to Mexico, thereby threatening a liquidity crisis in Mexico, which could in turn put at risk a secure U.S.–Mexico border and jeopardize the position of other emerging markets is as serious a consequence as terminating funds to a government agency — the threatened situation considered in the 1973 Opinion. To compel the President to choose between violating his constitutional duty to withhold documents when that is required by the public interest and failing to honor a commitment to a foreign sovereign, just as surely would deny the President a meaningful choice. The choice presented to the President under House Counsel's interpretation of section 406 would be particularly hollow because — in contrast to the statutes at issue in the 1960 and 1973 opinions, which apparently sought to deny funds *prior* to their being obligated by the executive branch — the certification requirement would have forbidden the disbursal of funds already committed.

## IV.

As then-Assistant Attorney General Barr has cautioned, in analyzing the scope of Congress's use of its power over finances to control the activities of the coordinate branches of government, "the easy answer is probably not a correct answer."[75] In the absence of a large body of case law interpreting the separation of powers issues raised by congressional efforts to use its appropriations power to control the President's exercise of his foreign affairs powers,[76] long-standing executive branch practice is a primary authority for the proper interpretation of

---

[74] *Id.* at 4–5. The Act as finally enacted did not include the unconstitutional provision. Department of State Authorization Act of 1973, Pub. L. No. 93–126, 87 Stat. 451.

[75] Panel symposium on *The Appropriations Power and the Necessary and Proper Clause*, 68 Wash. U. L.Q. 626, 626 (1990).

[76] The Supreme Court itself has labelled "the decisions of the Court in this area . . . [as] rare, episodic and afford[ing] little precedential value for subsequent cases." *Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981). The paucity of judicial decisions is partly a result of the fact that many of the issues are non-justiciable, and partly a product of the courts' proper reluctance to intrude into the decisions of the political branches in the area. *See Chicago & Southern Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.").

the Constitution. As one commentator has noted: "Most of the law here consists not of judicial precedents but of historical ones; legitimacy is found in repetition, innovation, and acceptance."[77] The history of the relationship between Congress and the President in this area is one of delicate accommodation, and wherever possible the executive branch has sought to construe statutes in a manner that avoids rather than creates confrontation. Our April 14 Letter continued that history.

The President's constitutional authority to control disclosure of diplomatic communications, and the invalidity of congressional attempts to compel the President to relinquish his constitutional powers by the imposition of conditions on expenditures, are directly relevant to the correct interpretation of section 406. Read as House Counsel does, the effect of the statute would be a dramatic intrusion into the President's conduct of foreign relations. At the time section 406 was enacted, the President had already taken action, pursuant to his statutory authority with respect to the Exchange Stabilization Fund, that constituted a United States commitment of emergency assistance to Mexico. Failure to honor that commitment would risk a sovereign default, severe hardship within Mexico, with direct consequences for the United States.

According to House Counsel, section 406 required the President either to accept these serious consequences or to surrender his constitutional authority to determine which documents relating to the Mexico assistance program could be disclosed consistent with the public interest. As we have discussed, the Constitution does not permit Congress to employ its fiscal powers to compel such a surrender, and the interpretation of section 406 advocated by House Counsel thus would raise a serious question about its validity. Moreover, the validity of section 406, read in this manner, is not saved by the accommodation process outlined in section 406(b). Compliance with that subsection would require the President to share with the Speaker and other members of the House his discretion to determine which documents could be disclosed and would entail disclosing every document, regardless of its contents, to at least some members of the legislative branch. The President's constitutional authority to control disclosure, however, vests in him unilateral exercise of judgment about disclosure, and to decline to disclose appropriate documents entirely. As this Office has observed in the past, the President's authority over diplomatic information, unlike certain other constitutionally grounded privileges, is not subject to balancing: it is absolute.[78] Congress may not use conditions on spending to control or compel a waiver of such a presidential power.

---

[77] Peter J. Spiro, *War Powers and the Sirens of Formalism* 68 N.Y.U. L. Rev. 1338, 1340 (1993); *see also The Pocket Veto Case*, 279 U.S. 655, 688–90 (1929) ("Long settled and established practice is a consideration of great weight . . . .").

[78] *See, e.g.,* Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* (Dec. 21, 1989); Memorandum for Arthur B. Culvahouse, Jr., Counsel to the President, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutional Concerns Implicated by Demand for Presi-*
Continued

It is the duty and practice of the executive branch to avoid statutory constructions that unnecessarily raise grave doubts about the constitutionality of congressional measures. Respect for Congress, furthermore, counsels reluctance to interpret a statute so as to require the assertion of a presidential power to act contrary to the statute. It was the obligation of this Office, therefore, to seek a construction of section 406 that avoided interpreting it as an attempt to override the President's constitutional powers.

By referring to House Resolution 80, which contained the traditional public interest exception, to define in part the certification required by the Act, section 406 itself provided a construction that obviated the need for the President to assert his constitutional authority.[79] The April 14 Letter therefore construed section 406 to include the public interest exception contained in Resolution 80. In doing so, the advice of this office followed executive practice dating back to the beginning of the Republic.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

*dential Evidence in a Criminal Prosecution* (Oct. 17, 1988); *see also Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978) (President's control over communications containing state secrets is absolute).

[79] Because the position adopted in the April 14 Letter was the appropriate construction to give the statute, we need not resolve the difficult question of what the Executive's legal view would have been if the statute had not been expressly linked to House Resolution 80. We do note, however, that in the past this Office has opined that the President was entitled to disregard a severable, unconstitutional condition on statutory spending authority, and proceed to employ that authority. *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18 (1992) (Acting Asst. Att'y Gen. Flanigan); *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37 (1990) (Asst. Att'y Gen. Barr); Memorandum for the Honorable Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Myers Amendment* (Aug. 30, 1977).

As this Office has concluded, the President does not, by signing a piece of legislation, "barter away" his responsibility to treat an Act as unconstitutional. Memorandum for the Honorable Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Myers Amendment* at 8 (Aug. 30, 1977); *see also* 14 Op. O.L.C. at 46 n.10 ("The analysis of [whether the President may refuse to enforce an unconstitutional condition on an appropriation] does not depend on whether the President signed the bill or not. As the Supreme Court has observed, 'it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds.' That the President has signed the bill in no way stops his ability to assert the bill's unconstitutionality, in court or otherwise.'") (citation omitted).